1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DANIEL C. CLARKE,         )
                            )
        Petitioner,     )     No. C 09-3232 CRB (PR)
                            )
   vs.                  )     ORDER DENYING PETITION
                            )     FOR A WRIT OF HABEAS
JAMES A. YATES, Warden,   )     CORPUS AND GRANTING
                            )     CERTIFICATE OF
        Respondent.   )     APPEALABILITY AS TO
_____)     CONFRONTATION CLAUSE
                                  CLAIM

Petitioner Daniel C. Clarke, a state prisoner incarcerated at Pleasant Valley State Prison has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 claiming that (1) the admission of evidence of prior uncharged sex offenses at his trial violated due process; (2) the prosecution failed to produce exculpatory evidence to the defense; (3) the prosecution destroyed exculpatory evidence; (4) the trial court's limitation on cross-examination of defense witnesses violated the Confrontation Clause; and (5) petitioner received ineffective assistance of both trial and appellate counsel.

For the reasons set forth below, the petition is denied.

//

//

## STATEMENT OF THE CASE

Petitioner was convicted by jury in Santa Cruz County Superior Court on fourteen (14) counts of committing a lewd act upon his stepdaughter, a child under the age of 14 (Cal. Penal Code § 288(a)), and one (1) count of attempting a lewd act (Cal. Penal Code, §§ 664, 288(a)).  On November 18, 2005, he was sentenced to 33 years in state prison.

On November 30, 2005, petitioner appealed his conviction to the California Court of Appeal.  On June 1, 2007, the Court of Appeal affirmed petitioner's conviction in an unpublished opinion.  On July 11, 2007, petitioner filed a petition for review with the California Supreme Court.   On August 15, 2007, the California Supreme Court denied the petition for review.

On December 2, 2007, petitioner filed a petition for writ of certiorari in the United States Supreme Court.  The petition was denied on March 17, 2008.

Petitioner filed a habeas petition in Santa Cruz County Superior Court, which was denied on September 25, 2008.  On January 14, 2009, petitioner filed a habeas petition in the California Court of Appeal, which was denied on January 29, 2009.  On February 9, 2009, petitioner filed a habeas petition in the California Supreme Court, which was denied on March 25, 2009.

Petitioner filed the instant petition on July 15, 2009.

## FACTUAL AND PROCEDURAL BACKGROUND

The California Court of Appeal summarized the factual and procedural background of the case as follows:

### A. The Information

The information filed April 6, 2005, charged defendant with committing 15 lewd acts upon a child under the age of 14 between June 30, 2003, and November 15, 2004 (Pen. Code, § 288, subd. (a); counts 1-15), with a special allegation that defendant was ineligible for probation because he had substantial sexual conduct with the victim in counts 1 through 14 (Pen. Code, § 1203.066,

subd. (a)(8)). The alleged victim was M., defendant's 13-year-old stepdaughter. The prosecution withdrew the probation-ineligibility allegation at the end of the trial.  Count 15 was submitted to the jury as an attempted lewd act (Pen. Code, §§ 664, 288, subd. (a)).

**B. The Pretrial Motion To Admit Section 1108 Evidence**

The People filed a pretrial motion seeking the admission of evidence concerning defendant's uncharged sex crimes, including evidence of the molestation of his 13-year-old stepdaughter, T.B., in 1996 and the molestation of his 13-year-old niece, S.V., in 1988. They argued that the evidence was admissible under section 1108 to show defendant's propensity to commit sexual assaults on young girls with whom he had a close relationship. Further, the People asserted that the evidence was not subject to exclusion under section 352 because it was highly probative and not unduly prejudicial.

On October 27, 2005, the trial court held a hearing on the pretrial motion. The court ruled that the evidence of an uncharged sex crime involving defendant's stepdaughter T.B. was admissible under section 1108, despite T.B.'s later recanting of her report that defendant had sexually assaulted her, because the evidence was sufficiently reliable to be put before the jury.

However, the trial court determined that testimony from S.V. was needed before the court could rule on the admissibility of the section 1108 evidence concerning her. The trial court therefore held a section 402[1] hearing on October 31, 2005. S.V. appeared at the hearing and testified that defendant had molested her when she was 13 years old. The trial court found S.V. to be credible and her testimony probative, and therefore ruled that the section 1108 evidence concerning S.V. would be admitted at trial.

---

[1]      Section 402 provides, "(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article. [P] (b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests. [P] (c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

**C. Trial**

**1. Evidence Regarding the Charged Crimes--Victim M.**

*Testimony of M.*

At the time of her trial testimony in November 2005, M. was 14 years old. Defendant is her stepfather. By the age of eight, M. was living in an apartment in Redding with defendant, her mother Melinda,[2] and her older sister, J. At that time, defendant would occasionally give her a back massage. Once defendant took her pants off and gave her a full body massage. M. felt uncomfortable because she already had breast development and she was only wearing her underwear. However, sometimes M. asked defendant for a massage if her back or feet hurt.

When M. was 11, the family moved to Santa Cruz. They made many trips between Santa Cruz and Redding after their move. Another incident occurred during one of those trips. Her mother was driving the car and defendant was in the back seat with M. M. fell asleep and when she woke up, her overalls were undone and defendant's hand was in her pants, touching her vaginal area.

While the family was living in Santa Cruz, defendant was nicer to her than he was to her sister J. In October or November of 2003, another incident occurred. M. was in the sixth grade at the time. She had gone to bed and was almost asleep when defendant came into her bedroom and pulled her underwear down. While M. pretended to be asleep, defendant put his finger inside her vaginal area. Two minutes later, defendant pulled her underwear back up and said, "You're not going to rat me out, are you?"

During the following year, defendant came into M.'s bedroom at least twice a month and did exactly the same thing, except on one or two occasions when he put his mouth on her vaginal area. When the case was investigated, M. told a deputy sheriff that defendant put his finger inside her 10 to 15 times. Sometimes defendant came into her room and molested her when her sister J. was sleeping in the same bed. J. did not wake up because she is a sound sleeper.

The first person M. told about the molestations was her classmate K., in whom she confided. M. was afraid to tell anyone else because disclosing the molestations would "just rip our whole family apart." When defendant's adult daughter Shannon moved in, they had a conversation about defendant treating M. differently than her sister, J., and how defendant also treated Shannon

---

[2]     For the purpose of clarity and not out of disrespect, we will refer to Melinda Clarke, Shannon Marie Clarke, and Beatrice Clarke by their first names.

differently than her sister, T.B. M. also wrote a poem for Shannon that told her what had happened with defendant.[3]

The last time anything sexual happened between defendant and M. was in November 2004. Defendant told M. that if she went upstairs and did him a favor he would give her anything she wanted. M. hesitated, but eventually she went upstairs and defendant followed her. They went into his bedroom, where defendant told M. that if she gave him a massage on his "private area" he would give her anything she wanted. When M. said no, defendant pulled his boxers halfway down and exposed himself. M. became afraid, pushed defendant out of the way and left the bedroom. Defendant later told her that he was sorry and that he was in counseling and needed help.

Near the end of 2004, M. showed J. something that she had written in her diary about the molestations. By that time, the family had moved from an apartment in Santa Cruz to a five-bedroom house. J. told M. that she should tell their mother about the molestations, but M. was reluctant. M. later threw the diary away. She wanted to keep the molestations hidden because she was embarrassed and afraid of the impact on their family.

However, M. revealed the molestations during a therapy session with therapist Ivan Foote. M. attended the therapy session with J. and their mother. M.'s mother wanted to know what was in M.'s diary, because M. had threatened defendant with disclosure of the diary, but M. was reluctant to say anything. Foote gave her a pad of paper and a pen and M. wrote, "He fingered me."  M. gave the note to her mother and left the room. Her mother was really upset and

_____

[3]     The following poem was introduced into evidence as Exhibit 5: "A shadow, a stairway, a man in the night. As I feel him approaching my bed I [pray] it is a dream, but [it's] not. I pretend to sleep [which] may only make it worse. I hate this. I hate life. It seems sometimes as if death may be the only [choice]. Other times I try to forget. Feeling lost, sad, angry, curiosity, confusion and [embarrassment] all at one time. My [soul] is slowly drifting away. If I tell there will no longer be 'our family' just a [bunch] of people torn apart, but they will never be as torn apart as I am inside. Who can I talk to? Who will understand? [P] Is this man I despise a friend or an enemy? [P] If I had the [choice] I [would] rather be the most ignored person on the earth [instead] of this. I don't [] want to be liked anymore."

when she found M., she talked to her to make sure that really happened. Foote told them that he was required by law to report the molestations.

After the therapy session, M., her mother and her sister J. went to the apartment of their family friend and former neighbor, Patty Fitzgerald. M. next saw Fitzgerald one month later, when Fitzgerald came to M.'s house and a confrontation ensued. M. shut Fitzgerald out of the house, but Fitzgerald banged on the door and said, "You little slut. [Defendant] didn't rape you, and even if he did, you liked it." M. ran out of the house and went to the hospital where her mother worked. As M. was running away, Fitzgerald followed her in her car and yelled out the car window, "Oh, go crying, you little slut."

M. would describe herself as having a temper and mood swings. However, she denied that she made up the story that defendant molested her so that she could get a third ear piercing and dye her hair black.

*Testimony of J.*

M.'s sister, J., was 16 years old at the time of her trial testimony. J. recalled that defendant treated M. better than her. She also recalled M. showing her a journal entry about a girl with a secret and a picture of a girl standing under a rain cloud. M. asked J. not to say anything about it because M. wanted to tell their mother when the time was right. M. later tore up the journal page.

After the family moved from the apartment in Santa Cruz to a house, defendant shouted a lot and M. was upset. Their mother felt that defendant's adult daughter Shannon was freeloading. Their mother had asked defendant and his daughter Shannon to move out while the rest of the family was in Placerville for the New Year's holiday weekend. However, their mother and defendant reconciled over the weekend and they all continued living together in Santa Cruz.

J. never saw defendant touch M. inappropriately. During the car trip from Redding, J. saw defendant put his head on M.'s lap, but she did not see his hand down her overalls. On many occasions J. asked defendant to give her back rubs for a back problem. At the therapy session with Ivan Foote on January 10, 2005, J. observed that their mother was upset and shocked when she saw what M. had written on the notepad. J. was also present when M.'s poem for Shannon about what had happened was found in a coat pocket.

*Testimony of Melinda*

Melinda is the mother of M. and J. Defendant started living with them in 1998. The family moved to Santa Cruz in 2003. On their car trips between Santa Cruz and Redding, defendant would get in

the back of the car while she was driving and put his head on M.'s lap. Melinda never saw anything unusual occur. Defendant never said "no" to M. and gave her whatever she wanted.

Melinda and defendant got along fairly well until defendant's daughter Shannon moved in with them in June 2004. At the end of 2004 there was a lot of tension in the house. Melinda believes that M. heard her arguing with defendant and told him to leave her mother alone or she would tell her about the diary. Melinda decided to get away by going to her grandmother's house in Placerville for the New Year's holiday. She told defendant that he and his daughter were to be gone when she got back. Defendant indicated that he would comply. However, Melinda decided to give their relationship another try.

Regarding the therapy session with Ivan Foote, Melinda recalled that M. asked to go with them. After J. gave M. paper and a pen during the therapy session, M. wrote "He fingered me." Melinda was shocked and surprised. After writing the note, M. walked out of Foote's office and Melinda found her in a stairwell shaking uncontrollably. M. told Melinda that she was not lying. They waited while Foote telephoned Child Protective Services. When Melinda returned home a day later, she found a note from defendant indicating that he had left. Several days later, she found a note written by M. that she turned over to police.

Melinda denied that she conspired to get rid of defendant by fabricating the child molestation allegations because she wanted to return to J.'s father.

*Testimony of K.*

K. was 14 years old at the time of her trial testimony. She and M. became best friends when they were in middle school. They would tell each other things they did not want anyone else to know. K. sometimes spent the night at M.'s home. On one occasion when she was visiting M., she overheard M. and J. arguing. J. wanted to know why defendant was treating M. so well and M. said she could not tell her. K. asked M. what was wrong and what they were arguing about. M. refused to answer.

M. eventually confided in K. about what was upsetting her. During their physical education class, K. asked M. if she was okay and M. said she was fine. K. asked M. several more times if she was fine, and M. finally said that defendant had been touching her at night in her bedroom with his fingers and his tongue. K. told M. to tell someone, but M. said she could not tell anyone because her family would be torn apart, become poor, and hate her. K. continued to tell M. almost every day during the school year that she should tell someone and M. continued to refuse to do so. K. thought that M. was moody and depressed.

7

After August 2004, K. had little contact with M. The only other conversation they had about defendant was six days before Christmas in 2004. K. saw M. at the mall and asked her if defendant had been touching her and if she had told anyone yet. M. said that defendant had been getting counseling and was not touching her anymore. K. told her mother about M.'s allegations, but her mother never contacted the authorities.

*Testimony of Jeannie K.*

Jeannie K. is K.'s mother. In March or April of 2004, K. told her that M. had said that defendant was molesting her. She did not notify any authorities because she did not want to become involved. Instead, she told K. to have M. tell her mother or the school or someone else.

*Testimony of Ivan Foote*

Ivan Foote is a licensed marriage and family therapist. J. had an appointment with him on January 10, 2005, at 6:15 p.m. On that day, J. came to the appointment with her mother and her sister, M. When they arrived, M. seemed upset. Foote asked her if she was okay, and M. became very emotional, put her hands over her face, and began sobbing. His attempts to communicate with her orally failed, and J. suggested that M. could write down what was going on with her. Foote handed M. a pad of paper and a pen and she wrote, "He fingered me." Foote asked her who had done that, and M. replied it was her stepfather.

M.'s mother was shocked and incredulous. The family stayed in or around Foote's office for nearly two hours while Foote telephoned Child Protective Services. During that time, M. seemed very emotional and embarrassed. None of the family members laughed or seemed lighthearted. They left his office at about 8:30 p.m.

*Testimony of Shannon*

At the time of her trial testimony, Shannon was 21 years old. She is defendant's daughter. Melinda was her stepmother and M. and J. were her stepsisters. Shannon moved to Santa Cruz in June 2004 and lived with defendant, Melinda, M., and J. in their apartment. When they were living together, Shannon and Melinda had a mutual dislike of each other. Shannon was 20 years old, unemployed most of the time, not going to school, and not paying rent. There was also tension between Shannon and M., which Shannon believed was due to her father spending time with her instead of M. However, defendant treated M. better than her sister J.

Shannon saw defendant give back rubs and massages to Melinda, J. and M. at their request. M. frequently had tantrums because she did not like being told what to do. One day M. gave Shannon a poem

8

that caused Shannon to ask M. if there was something she wanted to talk about. M. declined to discuss it and Shannon showed the poem to Melinda and defendant. Melinda thought M. was just expressing her creativity and defendant suggested counseling.

By Christmas 2004 there was a lot of tension in the house because of Shannon. She understood that she and defendant were supposed to leave the house while Melinda, M. and J. went to Placerville. They packed their bags and were getting ready to leave when Melinda called and said she did not want them out. Things then returned to normal until the day of the counseling session, January 10, 2005, when Melinda's attitude suddenly changed.

Shannon never saw defendant touch M. inappropriately. He is not the kind of person who would do that. She would have heard defendant if he went into M.'s room at night and touched her. Her recollection is that J. was a light sleeper because J. would wake up when Shannon passed by her bedroom during the night on her way to the bathroom.

*Testimony of William Andrade*

William Andrade was married to Melinda's mother, Judy. M. and J. are his stepgranddaughters. Melinda, M. and J. lived with him in 1994 and 1995. Andrade recalled that M. had frequent tantrums when she did not get her way.

Andrade also knew defendant during a two- or three-year time period when they were all living in Redding. He observed defendant interacting with M. and J. and never saw him do anything inappropriate. In his opinion, defendant would never touch a child improperly.

*Testimony of Beatrice Regarding M.*

Beatrice is defendant's mother. Defendant has lived with her on and off for many years. Before defendant, Melinda, M. and J. moved from Redding to Santa Cruz, they lived with her for four months. Defendant and M. got along well. M. would seek his attention and ask for a foot massage or a shoulder massage. She was not afraid of defendant, either in Redding or when Beatrice visited the family in Santa Cruz.

*Testimony of Patricia Fitzgerald*

Patricia Fitzgerald was a neighbor of defendant, Melinda, M. and J. when they lived in the same apartment complex in Santa Cruz. Fitzgerald became best friends with Melinda and also considered defendant to be a friend. She was in their apartment almost every day. She observed that while defendant and M. argued a lot, M. was never uneasy around defendant. Defendant treated M. better than J. However, Fitzgerald and M. had a mutual dislike of each other.

9

Fitzgerald remembered the day of the counseling session (with Ivan Foote in January 2005). Melinda, M. and J. came to Fitzgerald's apartment after the counseling session. At that time, Melinda told Fitzgerald that defendant had been  molesting M. Melinda did not seem to be upset and M. asked if she could get a third hole in her ear and dye her hair black the next day as she had been promised. Everyone was laughing about the accusations.

At a later date, Fitzgerald went to Melinda's house and became involved in a confrontation with M. in which she told M. that she did not believe her. After Fitzgerald left in her car, she saw M. in the middle of the road. M. swore at Fitzgerald as she drove slowly by. Although M. was only 13 or 14 years old, Fitzgerald said to her, "You better get home, little girl, before you get raped being out here in the dark."

In Fitzgerald's opinion, defendant would not do anything inappropriate with children. She believes that Melinda was setting defendant up and that M. requested the ear piercing and black hair dye as a pay off for making the molest allegations. Fitzgerald recalled that Melinda told her before going on the trip to Placerville that she wanted to leave defendant for J.'s father.

## 2. Evidence of Uncharged Crimes--Victim S.V.

*Testimony of S.V.*

At the time of her trial testimony, S.V. was 31 years old. She does not know M. or J. Defendant was married to her Aunt Joyce. When S.V. was 13 years old in April 1987, an incident involving defendant occurred. S.V. needed new shoes in order to attend a wedding. Defendant offered to take her to a shoe store. When S.V. and defendant arrived, the shoe store was not open and they decided to wait in defendant's van. Defendant said he was hot, removed his jacket and got into the back of the van. He then asked S.V. to get in the back of the van with him.

At that point, defendant asked S.V. if she had ever had intercourse, and S.V. said no. Defendant said it was time she knew what to expect. He then got on top of S.V. and touched her breasts and kissed her neck. Defendant also unbuttoned her pants and pulled her panties down while holding her arms above her head. When her pants were down, defendant rubbed her vagina and inserted his finger. S.V. began to cry and after a little while defendant allowed her to get up. When they returned to the front seats of the van, defendant said, "You shouldn't say nothing. It would cause problems in the family." When the shoe store opened, they bought shoes for S.V. and nothing was ever said again about the incident. Later the same day, S.V. told her grandmother what had happened. S.V.'s grandmother called S.V.'s mother, who reported the incident to the police. Subsequently, S.V. was removed from her father's

home because he was unable to care for her and sent to live with defendant and her Aunt Joyce. A second incident involving defendant occurred in 1990 when S.V. was 16 years old. While defendant was driving S.V. to get a Social Security card, he offered to buy her a car if she would have sex with him. S.V. refused and defendant proceeded to park in the parking lot of a Foster's Freeze. He pulled S.V. into the back of the van, got on top of her and kissed her breasts. Defendant then held her wrists above her head and rubbed her vagina and breasts while S.V. resisted him. She asked defendant to stop but he said he could not because she would tell. S.V. assured defendant that she would not tell anyone if he stopped. Defendant then got up and they put their clothing on and went home.

Later, defendant told S.V. not to tell anyone about the incident and that no one would believe her. S.V. subsequently reported the incident to three different law enforcement agencies, including the Lompoc Police Department. At their direction, S.V. called defendant but he did not admit anything. To her knowledge, no charges were ever filed. She most recently spoke to a police officer about the incident in 2005, when she talked to Detective Gonzalez of the Capitola Police Department. S.V. was hospitalized at the age of 16 after she attempted suicide. She did not want to stay in the hospital but neither her mother nor father was in a position to take her. S.V. was also told that a foster home placement was unlikely. When her Aunt Joyce and defendant came to the hospital, Aunt Joyce said that she could not get S.V. out of the hospital unless she wrote a letter saying that defendant had not molested her. S.V. wrote the letter, although her accusations were true.

### 3. Evidence of Uncharged Crimes--Victim T.B.

*Testimony of T.B.*

T.B. was 22 years old at the time of her trial testimony. Defendant was her stepfather. Her mother Joyce married defendant when T.B. was a baby. Shannon is T.B.'s half-sister. They lived with her [step]grandmother Beatrice, who is defendant's mother, in a house in Redding. Defendant treated T.B. a little bit differently than Shannon but that never harmed her in anyway.

In April 1996, T.B. went into foster care. Sometime later, she returned to the family home in Redding to live with her mother Joyce, her grandmother Beatrice, and her sister Shannon. When T.B. was in the eighth grade, in November 1996, her mother Joyce committed suicide following her divorce from defendant. In January 1997, T.B. went into foster care again. She subsequently left foster care and began living with her [step]grandmother and her sister. T.B. currently lives with her [step]grandmother Beatrice, her sister Shannon and her sister's husband in Redding. She does not remember telling Detective Gonzalez (of the Capitola Police Department) that she was worried about her grandmother getting

11

mad at her and kicking her out of the house. At present, T.B. is not afraid of being kicked out. She felt very pressured during the interview with Detective Gonzalez. Defendant raised her since she was a baby and she would not want to do anything to hurt him.

T.B. did not remember reporting in April 1996 that she was molested by defendant or recall talking to an officer from the Redding Police Department. She did not recall telling anyone that defendant came into her room, took her to her sister's room, and molested her. When asked whether she told anyone in 1996 that defendant had "put his private part in her private part," T.B. responded that she had "nothing to say." T.B. also did not remember telling Detective Gonzalez that her grandmother went to the district attorney's office in Redding and told them that the molestation never happened.

During her trial testimony, T.B. denied that defendant molested her in 1996. Her report to police in 1996 and to Detective Gonzalez regarding the molestation was false.

*Videotaped Police Interview of T.B.*

Detective Mark Gonzalez of the Capitola Police Department testified that he interviewed T.B. on January 10, 2005, in the course of his investigation of a sexual assault crime involving defendant. The interview was videotaped. Detective Gonzalez stated that the videotape was a fair and accurate representation of the interview before the tape was played for the jury. The jury was also provided with a transcript of the videotaped interview.

During the videotaped interview, T.B. stated that she knew M. and J. and was aware of the case involving defendant and M. because Detective Gonzalez had told her about it. When asked whether defendant had molested her, T.B. said yes. She also stated that everything in the Redding Police Department report about the molest charges was true. Her grandmother told the district attorney that the molestation never happened, and then she was put in a foster home.

T.B. asked Detective Gonzalez not to tell Shannon that T.B. had talked to him. She also stated that she did not want to testify at defendant's trial because she was afraid of facing the crowd and her family. T.B. was also afraid of being kicked out of the house if defendant found out that she had talked to the police.

Near the end of the interview, Detective Gonzalez left the room. While he was out, T.B. called M. on her cell phone. T.B. told M. that she was sorry that it had happened, that she was with the investigator, that she might not be in court to testify but that M. could call her if she ever needed to talk. T.B. also told M. that she could not handle it anymore, that she could not face "him," and "they" did not know that she was with the investigator.

After the videotape was played, defense counsel objected outside the presence of the jury that the tape was not proper impeachment absent a ruling by the trial court that T.B. was "being dishonest on the stand." The trial court then made a finding "that the numerous times [T.B.] answered she didn't remember, did not appear to be truthful to this Court. It appeared that she was reluctant to be here, was fearful for whatever reasons that her testimony would come back at
some point to get some sort of retaliation against her. By who, I don't know."

*Testimony of Albert Olson*

Albert Olson is a police officer with the Redding Police Department. In 1996, he was a detective investigating sexual assaults. He and another officer, Tracy Beaupre, investigated a report from Child Protective Services regarding T.B. During that investigation, Detective Olson interviewed T.B. She said that she had been molested by defendant in her house, when defendant took her from one bedroom to another bedroom, pulled both of their pants down, fondled her vaginal area and stuck "his private inside of her private." According to Detective Olson's report, defendant told T.B. not to report the incident. However, T.B. told her mother about it.

T.B. was placed in protective custody during the investigation. Charges were filed but ultimately dismissed by the Shasta County District Attorney's Office.

*Testimony of Tracy Beaupre*

Tracy Beaupre is a police officer with the Redding Police Department who assisted Detective Olson in investigating the child molestation allegations concerning T.B. Officer Beaupre spoke with T.B. after receiving a telephone call from Child Protective Services on January 10, 1997. T.B. told Officer Beaupre that her grandmother told the district attorney that the molest did not happen. However, T.B. stated that the molestation did happen. Officer Beaupre had another conversation with T.B. in April 1997 in which T.B. said that she had spoken to defendant while he was in custody in the Shasta County Jail. Defendant reminded T.B. that she did not have to testify against him.

During a third conversation in June 1997, T.B. told Officer Benson that she was afraid to testify against defendant because her grandmother and stepsister would be angry with her.

*Testimony of Beatrice Regarding T.B.*

Beatrice, as noted above, is defendant's mother. T.B. is her [step]granddaughter and she has lived with Beatrice most of her

life. Regarding the allegation that defendant molested T.B. in 1996, Beatrice stated that she did not believe it. At some point T.B. said the allegation was not true. Beatrice denied that she or anyone else had threatened to harm T.B. if she did not tell the district attorney that the allegation was false. Additionally, Beatrice denied that she had told a deputy district attorney that T.B.'s molest accusation was not true.

**D. Jury Verdict and Sentencing**

On November 15, 2005, the jury returned a verdict of guilty on all counts. At the sentencing hearing held on November 19, 2005, the trial court declared count 1 to be the principal term and imposed the middle term of six years. The court also imposed one-third the middle term on counts 2 through 15, for a total term of 33 years.

Before imposing sentence, the trial court stated its reasons for the sentence, which included the following: "There's a good side to you, [defendant], but I hear from [S.V.] and I hear from [T.B.] and she . . . tried to protect you as best she could. She didn't want to be here. She was forced to be here, but when I looked at that video tape, the truth came through. [P] . . . [P] It's as obvious as it could be that you molested her. And when I look at you - you shake your head. I don't expect you to admit it here in court. Your family is here. It's hard to do that. I can appreciate that. [P] . . . [P] But I hear from [S.V.]. I hear from [T.B.] and I hear from [M.], and the jury heard all of that, . . . [P] They believed that [M.] was telling the truth. They believed that [T.B.] was telling the truth and they believed that [S.V.] was doing the same thing. It came through, and there's no doubt in my mind that if you are released, you will do it again."

People v. Daniel Charles Clarke, 2008 WL 1576369, at 1-10 (Cal. Ct. App. June 1, 2007) (re-numbered footnotes in original).

## DISCUSSION

**A.      Standard of Review**

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of

14

the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]  Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'reasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  Id. at 411.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an

unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts, and only those holdings need be "reasonably" applied.  Id.

**B.      Legal Claims**

    **1.      Propensity Evidence Claim**

Petitioner claims that the admission at trial, pursuant to California Evidence Code section 1108[4], of evidence of prior uncharged sex offenses violated his due process right to a fundamentally fair trial under the Fifth and Fourteenth Amendments.  Pet. at 6A.  Petitioner can prevail on this claim only if the state courts' decision to allow the propensity evidence under section 1108 was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d) (emphasis added).  It was not.

The Supreme Court has left open the question whether a state law allowing admission of propensity evidence violates due process.  Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991) ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); see also Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001) ("[T]he Supreme Court

---

[4]In pertinent part, subdivision (a) of section 1108 provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."  Section 1108 is a carve-out that grants California judges discretion to admit evidence of prior uncharged sex offenses in order to show a propensity on the part of an individual to commit such crimes so long as the probative value of the evidence is not outweighed by the probability that admission of the evidence will necessitate undue consumption of time, or create undue prejudice, confusion, or mislead the jury.  Cal. Evid. Code § 352; People v. Falsetta, 21 Cal. 4th 903, 916 (1999).

has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith."). Based on the Supreme Court's express reservation of this issue as an "open question," the Ninth Circuit has held that a due process right barring the admission of propensity evidence is not "clearly established" within the meaning of section 2254(d). Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006); accord Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (reaffirming Alberni).[5]

Petitioner is not entitled to federal habeas relief on this claim. It simply cannot be said that the state courts' rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d); Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008) (because Supreme Court expressly reserved the question whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, state court's rejection of claim did not unreasonably apply clearly established federal law).

## 2.   *Brady* **Claim**

Petitioner claims that the prosecution knowingly withheld exculpatory evidence from defense counsel. Pet. at 6A. Petitioner asserts that the prosecution failed to turn over an allegedly recorded phone conversation between petitioner and the victim despite defense counsel's repeated formal and informal requests, as well as court orders, compelling discovery of the recording. Id. (citing Defendant's Motion to Dismiss for Failure to Provide Exculpatory

---

[5]The Ninth Circuit has further held that the state court's admission of uncharged offenses is not an unreasonable application of general due process principles of the Supreme Court as set forth in Loper v. Beto, 405 U.S. 473 (1972). Mejia, 534 F.3d at 1047.

Evidence, Ex. 1 at 263-269).[6]  Petitioner argues that this violated Brady v. Maryland, 373 U.S. 83 (1963).  Petitioner's claim is without merit.

In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of good faith or bad faith of the prosecution."  373 U.S. at 87.  Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  United States v. Bagley, 473 U.S. 667, 682 (1985).  A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  Id.  To establish a Brady violation, petitioner must show that the exculpatory or impeaching evidence was suppressed by the state, either wilfully or inadvertently, resulting in prejudice. Morris v. Y1st, 447 F.3d 735, 743 (9th Cir. 2006).

Petitioner's Brady claim was not addressed on appeal by the California Court of Appeal, nor was it addressed in a reasoned opinion on state habeas review.  Accordingly, this court conducts "an independent review of the record" to determine whether the state court's unreasoned rejection of the claim was an unreasonable application of clearly established federal law.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Here, the record shows that petitioner brought a pretrial Motion to Dismiss for Failure to Provide Exculpatory Evidence (Ex. 1 at 263-269), arguing that the prosecution failed to produce a recording of a phone conversation between petitioner and the victim which was referenced in a police report filed by the investigating officer, Detective Mark Gonzalez (id. at 295-296).  At the

_____

[6]All further exhibit references are to the exhibits lodged in support of Respondent's Answer to Order to Show Cause.

hearing on the motion, the trial court expressed doubt as to whether the phone conversation was even recorded, and decided to stay the motion pending trial testimony from Detective Gonzalez on this issue.  Ex. 3 at 25-29.  When Detective Gonzalez later testified at trial, however, neither the prosecution nor the defense questioned him about the phone conversation.  Ex. 4 at 3653-3669.  After the close of evidence but prior to verdict, defense counsel brought a Trombetta Motion to Dismiss for Failure to Preserve Material Evidence (Ex. 1 at 384-396), arguing that the prosecution failed to preserve the recording of the conversation.[7]  In denying the motion, the trial court found that the phone conversation was likely never recorded, and that even if it was, the recording was of no real probative value.  Ex. 4 at  4412-4418.

An independent review of the record shows that the state court's findings were reasonable.  Detective Gonzalez's report states:

> On 01/12/05 around 1700 hours, I was at victim [M.'s] residence. I provided Melinda [the victim's mother] a phone with digital recorder attached.  I gave instructions to Melinda and [M.] on how to use the recorder. [M.] agreed to speak to [petitioner] if he called.  I told [M.] to confront [petitioner] over the phone . . .
>
> Around 1800 hours, [petitioner] called the residence from a number in the 530 area code. [M.] answered and eventually confronted [petitioner].  Essentially, [petitioner] denied the allegations and told [M.] she was not telling the truth.  At one point, [M.] cried and yelled at [petitioner] that he knew the allegations were true. [Petitioner] hung up on [M.] and she continued to cry.  I left the digital recorder and phone at their residence and instructed them to record calls . . .

Ex. 1 at 296.  As defense counsel readily admitted at the Trombetta hearing (Ex. 4 at 4415:3-4), a fair reading of this report indicates that Detective Gonzalez was present during the phone conversation, not that the conversation was necessarily recorded.  Detective Gonzalez states that petitioner hung up on M. and that after

_____

[7]California v. Trombetta, 467 U.S. 479, 489 (1984) is discussed infra at Section B.3.

19

this M. "continued to cry," a fact that he could have discerned in person.  Ex. 1 at 296.  It is only after the conversation between petitioner and M. takes place that Detective Gonzalez states that he "left the digital recorder and phone at their residence and instructed them to record calls."  Id.  Further, the prosecution made an offer of proof at hearing that Detective Gonzalez transferred all recordings that M. made with the digital device onto a disk and that, after a thorough search, no recording of the conversation was found on the disk, nor on either the digital recording device or the computer Detective Gonzalez used to create the disk.  Ex. 4 at 4413:7-21.  The trial court's determination that the phone conversation was likely never recorded was not unreasonable in light of the evidence presented.  See 28 U.S.C. § 2254(d)(2).

Even if the phone conversation between petitioner and M. was in fact recorded, to prevail on his Brady claim, petitioner must show that the prosecution's failure to produce the recording "was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  Strickler v. Greene, 527 U.S. 263, 281 (1999); Gantt v. Roe, 389 F.3d 908, 913 (9th Cir. 2004); United States v. Kojayan, 8 F.3d 1315, 1322 (9th Cir. 1993).  Petitioner does not satisfy the standard.

In its review of the evidence, the trial court reasonably concluded that even assuming a recording of this exchange existed, it would have no real probative value.  Ex. 4 at 4418.  Detective Gonzalez's report of the phone conversation indicates that it consisted of petitioner denying M.'s molestation allegations and M. "yell[ing] at [petitioner] that he knew the allegations were true."  Ex. 1 at 296.   Petitioner cannot show that there is a reasonable

//

probability that use of the alleged recording at trial would have produced a

difference verdict.  See Strickler v. Greene, 527 U.S. 263, 281 (1999).

Moreover, as a party to the conversation, petitioner possessed the information he claims was wrongfully withheld.  Petitioner was free to testify to the substance of his phone conversation with M. at trial, as well as question M. about the conversation during cross-examination.  Where, as here, a defendant possesses the information that he claims has been withheld, no Brady violation will lie.  See Rhoades v. Henry, 596 F.3d 1170, 1181 (9th Cir. 2010) ("[t]here is no Brady violation when a defendant possessed the information that he claims was withheld") (citing Raley v. Ylst, 470 F.3d 792, 804 (9th Cir. 2006)).  Further, a defendant who claims he was denied exculpatory evidence must show that he was unable to obtain comparable evidence by other reasonably available means.  See United States v. Drake, 543 F3d 1080, 1090 (9th Cir. 2008).  Petitioner has failed to make that showing given that he was a party to the conversation, a record of the conversation was available through Detective Gonzalez's report, and both M. and Detective Gonzalez could have been questioned about the conversation when each testified at trial.

At the hearing on the Trombetta motion, defense counsel argued that the allegedly recorded conversation was exculpatory because it might include statements by M. that defense counsel might have been able to use to impeach M.'s trial testimony.  Defense counsel stated:

> There were statements made by [M.] on that phone call as well as statements that we could have cross-examined her on that may or may not be consistent with other statements that she made in the case.

> And of course, we'll never know, but it's a little hard to speculate what we would have done with it, but those are the issues that I would venture to speculate on.

//

Ex. 4 at 4416:17-25.  Although impeachment evidence is exculpatory within the

meaning of <u>Brady</u> (see <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972)), <u>Brady's</u> "reasonable probability" test requires more than mere speculation that evidence withheld was of such a nature that its exclusion undermines confidence in the outcome of the proceeding.  See <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6-8 (1995).  Petitioner has failed to provide anything beyond mere speculation that the allegedly recorded phone conversation included statements by M. that could have been used to impeach her trial testimony and ultimately undermine confidence in the jury verdict.

The state courts' denial of petitioner's <u>Brady</u> claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on this claim.

### 3.   *Trombetta* Claim

In a corollary argument to the above, petitioner claims that the prosecution destroyed the alleged tape-recorded conversation in violation of <u>Trombetta</u>.  The claim is without merit.

Under <u>California v. Trombetta</u>, 467 U.S. 479, 489 (1984), the government has a duty to preserve any evidence the exculpatory value of which is apparent and which defendant cannot obtain by other reasonably available means.  See <u>Grisby v. Blodgett</u>, 130 F.3d 365, 371 (9th Cir. 1997).[8]  Here, as noted above, the prosecution made an offer of proof and the trial court reasonably found that the conversation referenced in Detective Gonzalez's report was never recorded.

---

[8]As with petitioner's <u>Brady</u> claim, because there is no reasoned state court opinion addressing petitioner's <u>Trombetta</u> claim, this court conducts "an independent review of the record."  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).

Ex. 4 at 4412-18.[9]  But even if the conversation was in fact recorded and the government failed to preserve the recording, comparable evidence was available to petitioner.  As discussed above, petitioner was a party to the conversation and was free to question either M. or Detective Gonzalez about the conversation at trial.

Moreover, as also addressed above, far from being clearly exculpatory, the alleged recording was only potentially useful to petitioner in so far as petitioner's counsel speculated that it may have contained statements made by M. which might have been used to impeach her trial testimony.  Where the evidence at issue on a Trombetta claim is only potentially useful to a defendant, as opposed to clearly material and exculpatory, defendant must show that the government exhibited bad faith in failing to preserve the evidence in order to establish a due process violation.  Illinois v. Fisher, 540 U.S. 544, 547-48 (2004); Arizona v. Youngblood, 488 U.S. 51, 58 (1988); Villafuerte v. Stewart, 111 F.3d 616, 625 (9th Cir. 1997); United States v. Estrada, 453 F.3d 1208, 1212-13 (9th Cir. 2006) (no bad faith in part because there was no evidence of

---

[9]In his Traverse, petitioner claims that "the record will show [that] one or two days prior to trial the district attorney admitted that the tape defense had been requesting for many months, and that the [district attorney] had insisted he had given to defense on several occasions, had been destroyed during copying on Sept. 23, 2005."  Traverse at 16.  But the court's independent review of the record revealed no instance in which the district attorney stated any recording had been destroyed during copying.  Petitioner's Motion to Dismiss for Failure to Provide Exculpatory Evidence, filed two days before trial, makes no reference to this theory.  Ex. 1 at 263-269.  Rather, the recording that the district attorney "insisted he had given to defense on several occasions" was a different recording of a phone call placed by M. to petitioner.  This recording, referenced as 4874-005 "Clarke calling home," consisted of M. placing a call to petitioner's home phone number and receiving no answer.  Ex. 1 at 266.  This recording has no bearing on whether the phone conversation referenced in Detective Gonzalez's report was in fact recorded.

"malicious intent" by government).  Here, petitioner has made no such showing.
In the Trombetta motion, defense counsel argued in conclusory fashion that the
Capitola Police Department failed to comply with "well-established procedures
for the recovery of evidence," and that this amounted to bad faith.  Ex. 1 at 393.
But petitioner offered no evidence in support of this contention.  He did not
describe the "well-established procedures," or indicate how the Capitola Police
failed to comply with them.  Instead, petitioner merely relied on the testimony of
M.'s mother, Melinda Clarke, to argue that the phone conversation between
petitioner and M. "would have been recorded," and that, because no recording of
the conversation was ever produced, it must have been destroyed by the police
in bad faith.  Ex. 1 at 389-393.  This is not enough to establish "bad faith"
destruction of evidence.  See Fisher, 540 U.S. at 547-48.

The state courts' denial of petitioner's Trombetta claim was not contrary
to, or an unreasonable application of, clearly established federal law, nor based
on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).
Petitioner is not entitled to federal habeas relief on this claim.

### 4.   Confrontation Clause Claim

Petitioner claims that his Sixth Amendment right of confrontation was
violated due to limitations on cross-examination of prosecution witnesses
imposed by the trial court, as well as two trial court rulings regarding the
admission of impeachment evidence.  Pet. at 6B (citing Motion for New Trial,
Ex. 1 at 468-487).  The claims are without merit.

The Confrontation Clause of the Sixth Amendment does not prevent a
trial judge from imposing reasonable limits on cross-examination based on
concerns of harassment, prejudice, confusion of issues, witness safety or
interrogation that is repetitive or only marginally relevant.  Delaware v. Van

Arsdall, 475 U.S. 673, 679 (1986).  While the Confrontation Clause guarantees an opportunity for effective cross-examination, it does not guarantee a cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  Trial judges therefore possess "wide latitude" to impose reasonable limits on cross-examination of witnesses.  See Van Arsdall, 475 U.S. at 679.

To determine whether a criminal defendant's Sixth Amendment right of confrontation has been violated by the exclusion of evidence on cross-examination, a court must inquire whether:  "(1) the evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interests in presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness."  United States v. Beardslee, 197 F.3d 378, 383 (9th Cir. 1999) (citations omitted).  A defendant meets his burden of showing a Confrontation Clause violation by showing that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility . . . had counsel been permitted to pursue his proposed line of cross-examination."  Van Arsdall, 475 U.S. at 680; Slovik v. Yates, 556 F.3d 747, 753 (9th Cir. 2009).

A showing of constitutional error under the Sixth Amendment only merits habeas relief if the error was not harmless, that is, if it had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Holley v. Yarborough, 568 F.3d 1091, 1100 (9th Cir. 2009) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  Needless to say, "[p]recluding cross-examination of a 'central, indeed crucial' witness to the prosecution's case is not harmless error."  Id. (quoting Olden v. Kentucky, 488 U.S. 227, 232-33 (1988)).

//

25

Petitioner's Confrontation Clause claim was not addressed on appeal by the California Court of Appeal, nor was it addressed in a reasoned opinion on state habeas review.  Accordingly, this court conducts "an independent review of the record" to determine whether the state courts' rejection of the claim was an unreasonable application of clearly established federal law.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

### a.   Trial Court Limitations on Cross-Examination of Prosecution Witnesses

Petitioner challenges trial court limitations on cross-examination of prosecution witnesses on a number of topics.  First, petitioner challenges the limitation on the cross-examination of M. concerning her allegedly heightened and unusual interest in sex, her bipolar disorder and medications, and her understanding of truth versus a lie.  Ex. 1 at 472-474.  Second, petitioner challenges the trial court's limitation on defense counsel from asking M.'s mother, Melinda Clarke, about possible past abuse against M. by her biological father.  Id. at 474.  Third, petitioner challenges the trial court's ruling that the defense could not ask M.'s best friend, K., about the fact that K. herself had been the victim of a molest, that K. had reported it to authorities, that K.'s molester had been found guilty and sentenced to prison for twenty-four years, and that K. told M. about all of this prior to M.'s allegations against petitioner.  Id. at 475.  Petitioner similarly challenges the trial court's decision to preclude defense counsel from questioning all other witnesses concerning K.'s past molestation.  Id.  But after a careful review of the record, the court is satisfied that the alleged limitations on cross-examination imposed by the trial court were reasonable or harmless.

Petitioner claims that cross-examination on M's alleged preoccupation with sex was relevant to: (1) show that she was more likely than others to

fabricate sex charges, (2) demonstrate sources of knowledge from which she could describe the sexual acts that she accused petitioner of committing, as an alternative to the assumption that being molested was her only source of information, (3) contradict M's naive and "unknowledgable" presentation regarding sexual matters that the prosecution offered to the jury, and (4) show an alternative source of sexual abuse in her life.  Ex. 1 at 477-478.  After several long colloquies with the trial court, the court repeatedly determined that this evidence was not sufficiently relevant stating:

> She's almost a 14 year old teenager.  In our society, I can't imagine anyone is going to have difficulty believing that she could get this information from other sources.  It's not – we don't live in that type of society where these type of acts are withheld from our children.  They know about thees [sic] things.  (Ex. 3 at 4:19-25). . . .

> The point that I'm making is in our society, our jury people that come into court are not going to be surprised that a 13 or 14 year old girl knows that men masturbate, that there's digital penetration. . . . our jury's not going to say, "How in the world could she have known about these things, if not for the molestation?" . . .  [T]he prejudice to the People's case as opposed to very, very limited probative value of this is far outweighed.  (Id. at 6:2-16). . . .

> Teenagers know about sex.  They know about masturbation, digital penetration.  It's not something that's going to be a big mystery to them. . . . It's a character attack, is my read of this.  If you want to put this in front of the jury, it would make her look bad.  It's not probative.  It's not relevant to anything in this particular case.  (Id. at 9:11-25). . . .

> We're not – the allegations don't involve any highly unusual or sophisticated sexual act.  This isn't some far-fetched or far-reaching area of sex.  Digital penetration, one allegation of oral copulation, those are things – even masturbation, these are things that any 13, 14, 12 year old child would be expected to have been exposed to in some fashion or another.  (Ex. 4 at 2595:9-15).

The trial court further found that the cross-examination would have no impeachment value regarding the prosecution's alleged "naive" presentation of M.  The court noted that M. used the proper terms for male and female genitalia and used words at her grade level or higher.  Ex. 4 at 2597:21-2598:11.  The court stated:

> If she comes across as being naive, completely uninformed about sexual matters, that's different. She didn't come across that way. She said she was curious about these things. That doesn't indicate she's naive and had no knowledge of these things.

> If we're going to put a witness' sexual history on the stand in front of the jury, it has to be relevant to the issues of this case, and you don't put that in front of a jury. It tarnishes her without any probative value.

Ex. 4 at 2845:2-12. There is nothing objectively unreasonable about this ruling. See 28 U.S.C. § 2254(d).

The record also makes clear that it was reasonable for the court to find that the alleged evidence had minimal probative value, if any, to show greater likelihood of fabricating charges or to show other sources of abuse in M.'s life. And even if the evidence was somewhat probative, there were other legitimate interests outweighing petitioner's interest in presenting the evidence. These inquiries would unduly harass M., confuse the issues for the jury, or otherwise prejudice the jury against M. See Michigan v. Lucas, 500 U.S. 145, 149 (1991).

This conclusion is buttressed by the fact that the trial court's ruling did not prevent substantial cross-examination of M., allowing a full and fair opportunity to probe the weaknesses of her trial testimony. See Fensterer, 474 U.S. 15 at 22 ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose [witness] infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony."). A review of the record shows that M. was subjected to a thorough cross-examination. Ex. 4 at 2647-2709. The trial court even allowed some questions on M.'s sexual knowledge, over the prosecution's objections, including: (1) whether M. really was molested by someone else, and (2) what M. meant when she testified that she was "curious" about sexual matters. Ex. 3 at 16:12-18, Ex.

28

4 at 2845:13-2846:12.  And the jury heard M. testify that she had "a bad history with men."  Ex. 4 at 2531:17-18.  The trial court also permitted other cross-examination over the prosecution's objection, regarding: (1) why M. missed school so often, (2) whether M. had heard of other complaints against petitioner, and (3) whether petitioner had a reputation for abusive behavior toward other people.  Ex. 4 at 2671:7-2674:15, 2752:1-21, 2846:21-2847:4.  In view of the foregoing, it cannot be said that a reasonable jury would not have received a significantly different impression of M.'s credibility had the excluded impeachment evidence been admitted.  See Van Arsdall, 475 U.S. at 680.

The court was also within its discretion to limit cross-examination of M. concerning her alleged bipolar disorder and medications.  In its motion for a new trial, incorporated by reference in the petition, the defense argued that evidence of M.'s alleged bipolar disorder and medication would be relevant to her credibility and her ability to perceive and recollect events.  Ex. 1 at 478-479.  But nowhere did the defense claim that this evidence actually did affect M.  Indeed, at the court's urging, the defense could not make an offer of proof that M would testify that the medications clouded her judgment or her ability to recall.  Ex. 4 at 2601:11-19.  The defense did not plan to call an expert on this issue.  Id. at 2599:23-2600:20.  Rather, the plan was to have M. testify about what medications she was on and how they made her feel.  Id.  The court found the evidence irrelevant, stating:

> [O]ver and over, you have not given me any offer of proof that is connected to some sort of relevance.  Medications.  All right.  What are they?  Who is going to tell us what the [sic] effects those medications have on the body, the ability to perceive, recollect and come [to] court, and tell us about this mental health condition?
>
> Who's going to tell us what that means in a way that makes sense to the jury?
>
> Again, you have told me you have no expert witnesses to come to court and to tell us the effects of any of these medications what the diagnosis

was, when this diagnosis was made.  Those are the sorts of things that
could be relevant . . . .  Oh, my goodness, bipolar.  What does that mean?
There's no relevance to that label unless you can connect it to something
else.

Ex. 4 at 2842:22-2843:21.  This was a reasonable determination.  See 28 U.S.C.
§ 2254(d).

Further, the trial court allowed substantial questioning on M.'s temperament and behavior.  Ex. 4 at 2605:5-20.  M. admitted on the stand to having mood swings and tantrums and to being difficult to be around.  Id. at 2696:18-2697:6.  M.'s mother testified that M. sometimes had a moody personality and had thrown temper tantrums since the age of five, that she was harder to control than her sister and that there were occasions when M. ran out of the house and the family had to track her down.  Ex. 4 at 3005:9-3006:20. Melinda also testified to M.'s "demonstrative anger."  Id.  K. testified that M. was moody and would sometimes snap at people and that M. changed moods easily.  Id. at 3052:1-3054:15.  Petitioner's daughter Shannon testified at length that M.'s temper was "on and off"; that M. could be "unbearable;" that M. would scream, threaten and run away; that she had tantrums from the day Shannon first met her – often once or twice a day; and that she often refused to go to school.  Id. at 3783:7-3785:18, 3799:23-3801:3; 3805:14-20.  Defense witness Andrade, M.'s former step-grandfather also testified to M. being "moody" and frequently throwing temper tantrums when she didn't get her way. He stated that M. was "not an easy child."  Id. at 3911:15-3914:14.  Finally, defense witness Fitzgerald, M.'s former neighbor and family friend, testified that M. would throw a tantrum or get upset when Fitzgerald sat next to petitioner; that on one occasion M. called Fitzgerald a "motherfucking cunt" in response to being reprimanded; and that on another occasion, M. called her a "fucking whore" and a "fucking cunt."  Id. at 3994:14-3996:17; 4037:22-4040:8.  In sum,

30

the trial court's ruling did not prevent substantial evidence on M.'s erratic behavior.[10]  See Van Arsdall, 475 U.S. at 680.

The court was also within its discretion to limit cross-examination of M. concerning her understanding of truth versus lies.  The only specific "lie" that petitioner points to is M.'s having bought a lighter for a friend.  Ex. 1 at 474. And the trial judge found that asking the witness whether she had ever lied in the past was a collateral matter.  Ex. 4 at 3664:16-3665:3.  This was reasonable.  As noted above, the defense was allowed ample cross-examination of M.  The absence of this marginal background information, now claimed to be consequential, is certainly not significant enough to have altered the jury's opinion of M.'s credibility.  See Van Arsdall, 475 U.S. at 680.

The trial court's decision to limit the cross-examination of Melinda Clarke concerning alleged prior abuse of M. by M.'s biological father was similarly within the trial court's discretion.  The defense sought to introduce the evidence to show: (1) alternative sources of information from which M might have gotten the description of incidents, (2) an alternative explanation regarding M.'s acting out, and (3) why M. might be emotionally disturbed enough to make up allegations.  First, as noted above, the court did allow some limited questions on whether M. really was molested by somebody else.  Ex. 3 at 16:12-18.  As

---

[10]While the motion for new trial, incorporated by reference in the petition, mentions the defense's "added offer of expert testimony on the subject" (Ex. 1 at 473), a review of the record, shows that the defense re-issued the request to present this evidence later during the prosecution's case.  The colloquy does not reflect a clear request or readiness to present expert testimony.  Rather, the defense simply stated, "If we need to bring in a doctor, we'll bring in a doctor to talk about bipolar disorder."  Ex. 4 at 3073:21-22.  Nor was there an offer of proof in the record as to what the expert would have said at trial.  It was not objectively unreasonable for the trial court to let its evidentiary ruling stand under these circumstances.

also noted above, however, the trial court did not agree that M. needed "alternate" sources of sexual knowledge for the relatively straightforward acts she was describing.  Further, the trial court found that acting out as an adolescent was not aberrant enough to require such explanation, stating  "The fact that one acting out at a young age certainly wouldn't seem to indicate that she someone [sic] exposed her to sexual conduct." Ex. 3 at 14:11-13.  This was a reasonable determination under the circumstances.  See 28 U.S.C. § 2254(d).

Nor was evidence of prior abuse in of itself probative to show that M. would make up the allegations against petitioner.  It cannot be said that the trial court's exclusion of any such testimony was objectively unreasonable.  See id. And even if this testimony was arguably relevant to the defense's theory that M. fabricated the molest allegations, petitioner has not shown that his interest in cross-examination on the issue outweighed other legitimate concerns, including undue harassment of the witnesses, prejudice, and confusion of the issues.  See Lucas, 500 U.S. 145 at 149.

The same holds true with respect to the exclusion of evidence on K.'s prior molestation and the fact that K.'s molester had been sent to prison.  The defense sought to use the evidence to show another possible source of false allegation to the extent that K. informed M. on the possible consequences of making a molest allegation.  Ex. 1 at 481.  The trial court found that this was not relevant where the defense could simply ask M. if she knew the consequences of making these accusations. Ex. 4 at 2606:25-2607:2.  In fact, M. was asked if she thought about what would happen to her step-father if she told about the incidents, and she testified that she knew it would get him into trouble, which made her want to keep it hidden.  Id. at 2636:11-2637:4.  She also testified that coming to court to talk about the abuse "terrified" her.  Id. at 2763:25-2764:10.

To the extent the defense was trying to show a conspiracy between Melinda and M. to get petitioner out of their family, the trial judge found that K.'s knowledge of consequences was unnecessary because Melinda could just have easily given her daughter information on the consequences of molest accusations.  Id. at 3069:2-3072:24.  The court stated:

> [W]e have a 13 year old witness [K.] that's been molested . . . [a]nd you have her reliving part of that.  You're going to have to have some reason for that. . . . They don't need [K.'s] acknowledge [sic] if there's a plan to get rid of Mr. Clarke. . . .  [I]n order to bring that up here, the weight of this – it has very little value.

Id.  The court also noted following M.'s testimony, that there was no evidence that M. wanted to get petitioner in trouble and that her testimony was that, aside from the molest allegations, he was a great stepfather to her.  Ex. 4 at 3068:17-20.  Accordingly, it cannot be said that the trial court's ruling was objectively unreasonable.  See 28 U.S.C. § 2254(d).

Even if petitioner had met his burden of establishing a Confrontation Clause violation with respect to one or more of the limitations on cross-examination imposed by the trial court, he has not established that the violation had a "substantial and injurious effect or influence in determining the jury's verdict," as is required for habeas relief in this context.  See Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993).  M.'s testimony was corroborated by several other witnesses at trial.  While no witness had seen specific incidents of molest, the prosecution's witnesses gave consistent testimony and were able to confirm other significant parts of M.'s story – such as witnessing petitioner massaging M., laying his head in her lap, and treating M. differently than her sister, J.  See, e.g., Ex. 4 at 2777:16-24, 2788:25-2789:13, 2869:4-6, 2872:4-18, 2908:16-21, 2929:9-2930:1.  There was no evidence contradicting M. on material points.  Further, the prosecution put on strong propensity evidence

through two prior molest victims – S.V. and T.B.  While T.B. either denied the prior accusations or refused to comment whether petitioner had in fact molested her, two investigators were called to confirm T.B.'s past allegations, and the prosecution impeached T.B. with her videotaped interview wherein she: (1) admitted that the past allegations were in fact true, (2) stated that she was afraid of being kicked out of her house if her family found out that she had been speaking with the police, and (3) called M. to say that she was sorry that it happened and that she was available to talk.  People v. Clarke, 2007 WL 1576369, at **8-9.  It was reasonable for the jury to find – based on T.B.'s and S.V.'s testimony – that petitioner had a propensity toward molesting children, making it more likely that he committed the charged crimes against M.  Looking at the overwhelming evidence in total against petitioner, it cannot be said that the trial court's limits on cross-examination had a substantial and injurious effect on the verdict.  See Brecht, 507 U.S. at 637-38

Finally, although neither side has addressed it, the court has considered the Ninth Circuit's recent decision in Holley v. Yarborough, 568 F.3d 1091 (9th Cir. 2009), granting habeas relief to a petitioner who had been precluded from introducing impeachment evidence and cross-examining the alleged victim in a child molestation case.  The court finds it distinguishable from the present case.

In Holley, the trial court prohibited the defense from asking the victim any questions regarding sexual matters.  Id. at 1099.  The victim was an 11-year-old girl who accused defendant Holley of touching her legs and breasts and placing his hands up her shorts and shirt as she sat on his lap in a driver's seat. The 11-year-old victim claimed that she was steering the car, while the defendant operated the pedals.  Id. at 1095.  The whole incident allegedly took place during three car rides in one day.  Id.  The victim also alleged that at a later point in the day, the defendant exposed himself and asked her to remove

her clothes, which she refused.  Id. at 1095-96.  The victim's 10-year-old brother

was also present during the alleged incidents.  Id.  At trial, the court denied the

defendant's request to present testimony of two neighborhood children:

> that [the victim] had told them that she had done "weird stuff" in a closet
> with her boyfriend, a term she also used to describe what Holley had
> done in rubbing her legs and breasts; that a neighborhood boy wanted to
> "hump her brains out"; and that her brother . . . had once tried to have sex
> with her.

Id. at 1096-97.  On federal habeas review, the Ninth Circuit found that the trial

court's ruling constituted a Confrontation Clause violation.  Specifically, the

court found that the jury might reasonably have questioned the victim's

credibility in light of the intended cross-examination and that the error had a

substantial and injurious effect on the verdict given the importance of the

victim's testimony.  Id. at 1100.  Specifically, the court noted that the entire case

depended on the jury believing the victim, given that the prosecution had no

physical evidence of the abuse "nor any corroboration of her testimony aside

from the weak testimony offered by [the 10-year-old brother]."  Id. at 1100-01.

Here, in contrast, M. was older than the victim in Holley at the time of the

accusations and at the time of trial, and petitioner offered no specific examples

of inappropriate sexual statements or accusations made by M.  The evidence of

alleged "sexual preoccupation" was weaker and cannot be said to have

significantly altered the victim's credibility.  Van Arsdall, 475, U.S. at 680.

Furthermore, M. attested to a series of molest incidents spanning over two years,

as opposed to one day, and a number of prosecution witnesses corroborated M.'s

testimony, most significantly, two prior molest victims.  Thus, unlike Holley,

where the whole case turned on the believability of the 11-year-old victim, the

excluded testimony here did not affect the verdict.  Accordingly, Holley does

not mandate a different result here.

//

35

**b.** **Trial Court Rulings on Impeachment of Prior Victims**

Petitioner challenges two rulings the trial court made with respect to impeachment.  First, petitioner claims a tape-recorded interview between prosecution witness T.B. and Detective Gonzalez was improperly played for the jury as impeachment evidence.  Ex. 1 at 475.  The tape consisted of T.B. reaffirming allegations she first made in 1996 that petitioner had molested her. At trial, T.B. recanted these allegations and testified that they were false in 1996 when she first reported them to the police, and that they were false when she reaffirmed them during the taped interview with Detective Gonzalez.  Petitioner argues that the taped interview was not admissible, and should not have been played to the jury as impeachment evidence, because T.B. testified truthfully that she had told Detective Gonzalez during the interview that the allegations were true even though they were in fact false.  Ex. 1 at 475.  That is, petitioner argues that the taped interview could not have served to impeach T.B.'s testimony because she testified truthfully as to the contents of the tape.  But the Supreme Court has clearly established that "the Confrontation Clause does not require excluding from evidence the prior statements of a witness who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories." California v. Green, 399 U.S. 149, 164 (1970).

Further, the trial court made the finding that:

[T]he numerous times [T.B.] answered she didn't remember, did not appear to be truthful to this Court.  It appeared that she was reluctant to be here, was fearful for whatever reasons that her testimony would come back at some point to get some sort of retaliation against her.  By who, I don't know. . . .

So, it was very clear that she didn't want to answer those questions, and the entire tape showed the inconsistencies, impeachment. . . .

36

> It was very enlightening, and the call to [M.] may have touched on her believability of [M.], but more so the statement that she knew how [M.] felt.  She indicated one version of the allegation should be believed and one shouldn't. . . .
>
> It was very enlightening for the jury to see her body language and her reaction and emotions during that interview.  The jury has two versions. They need to know which one to believe, and this is very probative to the jury.

Ex. 4 at 3661:13-3662:10.  On this record, it was not objectively unreasonable

for the trial court to allow the taped interview to impeach T.B.'s trial testimony.

Second, petitioner claims that the trial court improperly refused to allow

impeachment testimony from defense investigator Cathy Johnson regarding

certain claims made by prosecution witness S.V.  Ex. 1 at 476.  Specifically, at

trial S.V. testified that Investigator Johnson mis-identified herself to S.V.  Ex. 4

at 3283:17-25.  S.V. also testified that she had incorrectly told Cathy Johnson

that she never wrote the letter from the hospital recanting the molest accusations.

Id. at 3284:5-6.  Petitioner sought to put Cathy Johnson on the stand to refute the

testimony that the investigator had mis-identified herself as well as to highlight

the adamance with which S.V. denied writing the letter during her interview

with Johnson.  Ex. 1 at 482-484.

A review of the record shows that toward the end of trial, the defense

called Cathy Johnson to the stand.  A sidebar conference and offer of proof took

place, after which the court stated Johnson would not be called after all, and the

defense rested its case.  Ex. 4 at 4114-4115.  Later, defense counsel put on the

record that they had intended to call Johnson to impeach S.V. on the point that

Johnson had allegedly misidentified herself and on the point regarding the letter.

Id. at 4123:18-4125:5.  The court stated that at the earlier sidebar, defense never

indicated that Ms. Johnson was going to testify about how she had identified

herself and that defense had failed to expand on the second point – regarding

how extreme S.V. had been in once denying the letter.  The court further found

that to the extent that it was raised at sidebar, there was not much relevance.  <u>Id.</u> at 4125:10-16.

It was reasonable for the trial court to find either that the defense had waived this issue or that the proposed testimony was insufficiently probative to warrant the additional witness.  S.V. had already admitted on the stand that she had denied the letter to Investigator Johnson (<u>id.</u> at 3283:17-3284:6, 3290:14-3291:20), and the defense had the opportunity to ask S.V. about the letter in cross-examination (<u>id.</u> at 3290:14-3291:20).

More importantly, S.V. was consistent on the core of her testimony, which was that petitioner had sexually abused her – a point that Cathy Johnson could presumably not dispute.  Notably, S.V. testified that she did not know M. and had not heard of her before trial.  <u>Id.</u> at 3085:14-16.  The defense presented no motive for S.V.  to come and testify untruthfully for the prosecution.  To the contrary, it appears S.V. came forward voluntarily fourteen years after petitioner last assaulted her.  The level of denial regarding the letter was a collateral issue that risked confusing the jury.  In sum, petitioner has failed to establish that the excluded testimony from Ms. Johnson was relevant to the defense or that the exclusion of her testimony prevented the defense from adequately probing the credibility of S.V.'s testimony.  <u>See</u> <u>Beardslee</u>, 197 F.3d at 383; <u>see</u> <u>also</u> <u>Fensterer</u>, 474 U.S. 15 at 20.

After a careful review of the record, the court concludes that the state courts' decision rejecting petitioner's Confrontation Clause claims was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  <u>See</u> 28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on these claims.

**5.** **Ineffective Assistance of Trial Counsel Claim**

Petitioner claims ineffective assistance of trial counsel on the grounds that the trial court rulings rendered counsel ineffective.  This claim is without merit on its face.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.  The right to effective assistance of counsel applies to the performance of both retained and appointed counsel without distinction.  See Cuyler v. Sullivan, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim under Strickland, petitioner must establish two things.  First, he must establish that counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms.  Strickland, 466 U.S. at 687-88.  Second, he must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.

A habeas petitioner has the burden of showing through evidentiary proof that counsel's performance was deficient.  See Toomey v. Bunnell, 898 F.2d 741, 743 (9th Cir. 1990).  He must also point to specific errors made by trial counsel.  See United States v. Cronic, 466 U.S. 648, 666 (1984).  He cannot state a claim of ineffective assistance of counsel otherwise.  Id.

//

Here, petitioner argues that his trial attorney was rendered ineffective due to the various evidentiary rulings limiting cross-examination discussed above. Pet. at 6B.  Specifically, petitioner references his Motion for New Trial, in which defense counsel argued that "the [trial] court erred in decisions regarding law during the course of the trial, resulting in violations of . . . the right to effective assistance of counsel under the US Constitution."  Ex. 1 at 484.  From the face of this allegation, it is clear that petitioner has failed to state a claim for ineffective assistance of trial counsel.  That is, petitioner does not point to specific errors made by trial counsel, nor even claim trial representation was deficient.  Rather, petitioner claims that the trial court erred on various decisions of law.  Id. at 468-484.  Petitioner has not met his burden of showing where his trial counsel's performance fell below "an objective standard of reasonableness" under prevailing professional norms.  Strickland, 466 U.S. at 687-88.  Nor has he "affirmatively prove[n] prejudice."  Id. at 693.

Petitioner is not entitled to federal habeas relief on this claim.  It simply cannot be said that the state courts' rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

**6.    Ineffective Assistance of Appellate Counsel Claim**

Petitioner claims that his counsel on appeal was ineffective.  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  A defendant must show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, defendant would have prevailed on appeal. Miller, 882 F.2d at 1434 n.9 (citing Strickland, 466 U.S. at 694).  Again, petitioner fails to meet the Strickland test.

40

Petitioner claims his appellate counsel was ineffective because, on appeal, counsel "only raised improper admission of '1108' propensity evidence and ignored all other constitutional errors." Pet. at 6B.  But appellate counsel does not have a constitutional duty under Strickland to raise every nonfrivolous issue requested by a defendant.  See Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997); Miller, 882 F.2d at 1434 n.10.  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  See Miller, 882 F.2d at 1434.  Appellate counsel therefore will frequently remain above an objective standard of competence even where he or she fails to raise all nonfrivolous issues on appeal.  Id.  Indeed, "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S. 259, 288 (2000); see also Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1985) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.").

Here, there is no indication that appellate counsel failed to raise nonfrivolous grounds on appeal.  Given the lack of factual and legal merit to the other claims petitioner now presents for habeas review, appellate counsel's decision to focus on the propensity evidence claim was well within the realm of his professional prerogative, and did not constitute unprofessional error.  See Miller, 882 F.2d at 1434 n.9 (citing Strickland, 466 U.S. at 694).

Petitioner is not entitled to federal habeas relief on his claim of ineffective assistance of appellate counsel.  It simply cannot be said that the state courts' denial of this claim was contrary to, or involved an unreasonable

//

application of, the <u>Strickland</u> standard, or that it was based on an unreasonable determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is GRANTED as to petitioner's Confrontation Clause claim and DENIED as to all other claims because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  The COA on petitioner's Confrontation Clause claim does not obviate the requirement that petitioner file a notice of appeal withing thirty (30) days.

The clerk shall enter judgment in favor of respondent and close the file.


SO ORDERED.

DATED:   Dec. 30, 2010      _____

                            CHARLES R. BREYER
                            United States District Judge



G:\PRO-SE\CRB\HC.09\Clarke, D1.denyhc.wpd